TRADE COMMISSION et al. v. BUSH.

No. 7783.   Decided July 15, 1953.   (259 P. 2d 304.)

See 63 C. J., Trade-marks, Trade-names and Unfair Competition, sec. 255. Trading stamps as constituting unfair competition. 52 Am. Jur., Trade-marks, Trade-names, etc., sec. 186; 133 A. L. R. 1087.

*Ray, Rawlins, Jones & Henderson,* Salt Lake City, *R. R. Bullivant,* Portland, Or., *W. S. Beinecke,* New York City, for appellant.

*Clinton D. Vernon,* Atty. Gen., *Quentin L. R. Alston, Francis C. Lund,* Asst. Attys. Gen., *Calvin L. Rampton, Sherman P. Lloyd,* Salt Lake City, for respondents.

HENRIOD, Justice.

Appeal from an injunction restraining Bush, Ogden grocer, from selling goods below cost as defined in the Unfair Practices Act.[1] Reversed.

Bush assails the findings and judgment as unsupported in fact or law. Specifically, that (1) no case was made showing that Bush sold below cost, either from a "cost" or "price" viewpoint, or that he had the intent to violate the act; and (2) that the Unfair Practices Act offends against the equal protection and due process clauses of the federal and state constitutions.[2] A third contention that

---

[1]Title 13-5-7, "Sales, less than cost.—(a)  It shall be unlawful for any person  *  *  *  to sell  *  *  *  any article  *  *  *  at less than the cost thereof to such vendor  *  *  *  for the purpose of injuring competitors and destroying competition  *  *  *  or when the effect of selling  *  *  *  at less than cost  *  *  *  may be substantially to lessen competition or tend to create a monopoly in any line of commerce; and he  *  *  *  shall also be guilty of a misdemeanor [fine or imprisonment or both]  *  *  *

"Cost Defined:  *  *  *  3.  When used in this act, the term 'cost to the retailer' shall mean the invoice cost  *  *  *  to the retailer within thirty days prior to the date of sale, or the date of offering for sale, or the replacement cost of the merchandise to the retailer, whichever is lower; less all trade discounts except customary discounts for cash; to which shall be added; (a) freight charges  *  *  *  and (b) cartage [charges]  *  *  *  and (c) a markup to cover a proportionate part of the cost of doing business, which markup, in the absence of proof of a lesser cost, shall be six per cent of the cost to the retailer as herein set forth after adding thereto freight charges and cartage  *  *  *."

[2]14th Amend., U. S. Const.; Art. 1, §§ 1 & 7, Utah Const.

the Retail Grocers Association, intervenor, violated the Sherman Act,[3] had "unclean hands" and therefore was disqualified as a litigant, we think is without merit.

As to point (2): Similiar Acts have been held valid under the police power[4] and generally when attacked under the due process and equal protection clauses,[5] although some authorities have invalidated such Acts in toto,[6] and others have voided only parts thereof.[7]

Bush opened a cash and carry grocery and installed the Sperry & Hutchinson green trading stamp system, a plan which has been held to be a legitimate adjunct of a legitimate business,[8] by issuing stamps to those desiring them, on all purchases, large or small, irrespective of markup. Thus, stamps were issued on items marked up 6% or 30%. He considered and treated their use as a cash discount, as this court and others have suggested it is.[9] The stamps are valued and are redeemable by the S & H Co. in cash at 1.66% or in merchandise at 2.08% of sales price. About 25% of the items are so-called 6% items,—staples ordinarily sold by merchants at cost as defined in the Act, which, generally speaking, is invoice price plus delivery costs and an arbitrary 6%.

Bush testified and it is not controverted that only one out of 1,000 sales is a 6% item (or items) unmingled with those having higher markups, the average of which, in-

---

[3]Title 15, U. S. C. A. §§ 1-7.

[4]*Wholesale Tobacco Dealers Bureau* v. *National Candy & Tobacco Co.*, 1938, 11 Cal. 2d 634, 82 P. 2d 3, 118 A. L. R. 486.

[5]*People* v. *Gordon*, 1951, 105 Cal. 2d 711, 234 P. 2d 287, and cases cited.

[6]*Cohen* v. *Frey & Sons, Inc.*, Md. 1951, 80 A. 2d 267.

[7]*State ex rel. English* v. *Ruback*, 1938, 135 Neb. 335, 281 N. W. 607.

[8]*Ex parte Drexel*, 1905, 147 Cal. 763, 82 P. 429, 2 L. R. A., N. S., 588.

[9]*State* v. *Holtgreve*, 1921, 58 Utah 563, 200 P. 894, 26 A. L. R. 696; *Sperry & Hutchinson Co.* v. *Hudson*, 1951, 190 Or. 458, 226 P. 2d 501.

cluding 6% items, is about 13%. Unassailed, also, is expert accounting testimony showing that a cash discount customarily is considered as a non-operating business expense, like advertising, accounting and similar expenses, includable in the cost of doing business, and also that the amount represented by the stamps, roughly 2%, is about the going rate of cash discounts.

The Trade Commission's Mr. Hale purchased 4 grocery items from Bush, all so-called 6% items,—unless, as urged, the value of the stamps issued with the purchase, is not includable in the statutory markup, but is merely a reduction in price, resulting in a sale below 6% and therefore below cost as defined in the Act. Bush argues that the cost of the stamps, largely passed on to his customers by way of a discount for prompt payment, is an advertising cost like that expended for newspaper, radio, television or other advertising, that it is a buffer against credit losses, constitutes a trade stimulant, offsets expenses incident to deliveries which a competitor, not he, may make, and is a customary cash discount, recognized as to type and amount in the industry, and by accountants, as a non-operating business expense, includable in any markup contemplated by the Act.

The Trade Commission says that an article priced at $1 with 2¢ or its equivalent value in stamps returned at the time of sale, is a 98¢ price no matter how you view it. There is support for such contention.[10] Bush insists the $1 price paid by everyone whether he receives or refuses the stamps, is constant whether the cash and carry merchant returns 2¢ as a discount for prompt payment, assuring him ready operating capital, eliminating advertising and accounting expenses, bad credit risks and interest on

[10]*Bristol-Myers Co.* v. *Picker*, 1950, 302 N. Y. 61, 96 N. E. 2d 177, 22 A. L. R. 2d 1203; *Ed. Schuster & Co.* v. *Steffes*, 1941, 237 Wis. 41, 295 N. W. 737, 133 A. L. R. 1071; *Sunbeam Corp.* v. *Klein*, Del. Ch. 1951, 79 A. 2d 603.

borrowed operating capital, or whether the credit merchant, for extended credit, finally may receive $1.02 for the item, the 2¢ additional to offset expenses he may have, but which the cash and carry merchant does not have. Hence, he reasons, there is no reduction in price. He also is supported by authority.[11]

Where the evidence unquestionably shows that Bush does not have the usual non-operating business expenses which his brethren, the credit and delivery merchants have, and where the statutory markup arbitrarily covers the cost of doing business, requiring the vendor to sell at a price higher than otherwise he might do in order to attract business, it seems not unreasonable to assume that his stamp cost, representing about 2% of sale price, and a customary discount, is an element of the cost of doing business intended by the legislature to be one of the costs of doing business included in the 6% markup. It becomes rather enigmatic, however, when that cost is passed along to the consumer as a discount, which, as a practical matter gives the housewife a $1 article for 98¢ if she redeems the stamps— and where such cost does not represent the more intangible type of benefit conferred where parking space is provided or where the customer is relieved of interest payments on borrowed capital and the like, although a definite and probably measurable economic kinship logically appears to exist between the two types of benefits conferred.[12]

Were we to determine this case solely on the basis of one or the other of the contestants' debatable and antithetical conceptions as to whether the price is static or is reduced when a discount is given, we feel that Bush has drawn a sharper and more acceptable sword, since the

[11]*Bristol-Myers Co.* v. *Lit Bros.*, 1939, 336 Pa. 81, 6 A. 2d 843; *Weco Products Co.* v. *Mid-City Rate Drug Stores*, 1943, 55 Cal. App. 2d 684, 131 P. 2d 856; *Food and Grocery Bureau, Inc.*, v. *Garfield*, 1942, 20 Cal. 2d 228, 125 P. 2d 3.
[12]*Bristol-Myers Co.* v. *Lit Bros.*, supra; *Weco Products Co.* v. *Mid-City Cut Rate Drug Stores*, supra; *Bristol-Myers Co.* v. *Picker*, supra.

discount he gives is common practice, is usual in amount, and could be used as well for types of advertising which all would agree are includable in the cost of doing business which the Act by fiat, sets at 6%. Had Bush issued stamps having a 6% value, thus indulging in a practice beyond the usual and customary, a wilful evasion well might result of a type that led a learned judge wisely to say in *Bristol-Myers* v. *Picker*, supra [302 N.Y. 61, 96 N.E.2d 184], that "Courts are not powerless to deal with obvious subterfuges" and that "There is time to deal with such situations when they are presented."

But we decide this case on a different ground,—that no prima facie case was established showing that Bush intended to violate the Act,—certainly not beyond a reasonable doubt.[13] He insisted that his only intent was to increase his business, not to harm anyone, frankly admitting that which we all know,—that any sales increase he enjoyed of necessity reduced the sales of another or others. He and his accountants considered and booked the cost of the stamps as a non-operating business expense, real to him, and certainly not a practice which of itself proves evil intent. Only one out of 1,000 sales possibly could be construed as a violation of the Act, and significantly in this case even that isolated sale has provoked a lively, able and intelligent debate and disagreement among learned counsel as to whether it is or is not a violation, depending on which of two technical and debatable accounting philosophies maintains. Incredible it seems that one would intend to violate a criminal statute by inducing,—or, if you please, "luring to improvidence,"—[14] a single housewife out of about 1,000, with bait of 8.3¢ in cash or 10.4¢ in merchandise on an average $5 purchase, occurring but once in a

---

[13]*State* v. *20th Century Market*, 1940, 236 Wis. 215, 294 N. W. 873; *Adwon* v. *Okahoma Retail Grocers Ass'n, Inc.*, 204 Okl. 199, 228 P. 2d 376.

[14]*Rast* v. *Van Deman & Lewis Co.*, 1916, 240 U. S. 342, 36 S. Ct. 370, 60 L. Ed. 679; L. R. A. 1917A, 421.

$5,000 sales volume. Particularly is this so in light of the declared purpose of the Act, to safeguard the *public* against *monopolies* by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed,—a purpose apparently directed at the vicious price wars of a past era, preambling an Act perhaps born of economic necessity or a changing philosophy, or both,—one of a rising tide of Unfair Practice Acts, many drawn in haste, loosely worded and provocative of constitutional doubts inviting irreconcilable decisions.

With deference to the findings of the lower court, nevertheless we feel dutybound to hold that the record reflects no intent on the part of Bush to violate the Act. The testimony of competitors, admittedly conscious or unwitting violators of the Act, that they had lost business since Bush issued the stamps, hardly proves an intent on the part of another to violate a criminal statute. Such loss of business at times attended the common-law free enterprise system and persists even now where Unfair Practice Acts in derogation thereof prevail. Nor can a criminal intent be proved by adding to such loss the Commission's suggestion that people normally do not admit violations of law. This court certainly will not ascribe to the oath-taker the infamy of a perjurious mind. We think, with every presumptive support, that people normally are honest and tell the truth.

Since a majority of the Court feels that it is unnecessary to discuss constitutional or other objections raised by counsel, such matters are not determined here.

McDONOUGH, CROCKETT and WADE, JJ., concur.

WOLFE, Chief Justice (concurring in the result).

I concur in the reversal of the judgment below on the ground that the giving of stamps to customers paying cash for merchandise, the value of the stamps being approximately 2% of the purchase price, does not amount to a reduction of the price of the article. If the stamps had a

value substantially in excess of 2%, which is the customary discount for cash, a different problem would be presented.

The other question discussed in the majority opinion being unnecessary for our decision, I express no opinion on it.