132 So.2d 252

**SIMONETTI, INC.**

v.

**STATE of Alabama ex rel. MacDonald GALLION, Atty. Gen.**

6 Div. 415.

Supreme Court of Alabama.

June 29, 1961.

Pritchard, McCall & Jones and Victor H. Smith, Birmingham, for appellant.

MacDonald Gallion, Atty. Gen., Guy Sparks, Sp. Asst. Atty. Gen., and Wm. H. Burton, Asst. Atty. Gen., for appellee.

John J. Smith, Birmingham, for Alabama Wholesale Tobacco Association, amicus curiae.

LIVINGSTON, Chief Justice.

The State of Alabama, ex rel. its Attorney General, filed in the Circuit Court of the Tenth Judicial Circuit of Alabama, in Equity, its bill of complaint to enjoin Simonetti, Inc., a corporation, from violating the so-called Unfair Cigarette Sales Act (Act No. 805, Acts of Alabama 1951, effective September 11, 1951), by advertising, offering for sale and selling cigarettes at wholesale in the State of Alabama below cost (as defined in Sec. IV(k) 1 of said Act) of such cigarettes to the appellant, and with the intent of injuring its competitors and destroying, or substantially lessening, competition.

The appellant, Simonetti, Inc., interposed its demurrers attacking the constitutionality of said Act as a whole, but not the constitutionality of any specific section or sections thereof.

Appellant's demurrers were overruled and the constitutionality of said Act was sustained by the trial court. Simonetti, Inc., a corporation, appealed.

The grounds of demurrer assigned, and the briefs, are properly concentrated in the main upon the very serious question of the constitutional validity of Act No. 805, Reg. Sess.1951, Legislature of Alabama, and it now appears in the Pocket Part of the Code of Alabama 1940 as Secs. 83(1) through 83(14) of Title 57.

The bill of complaint is bottomed solely and squarely upon, and seeks to enforce, the so-called Unfair Cigarette Sales Act. Sec. 3(a) of the aforesaid Act contains the following provision:

"It shall be unlawful for any wholesaler or retailer, with intent to injure competitors, destroy or substantially lessen competition, to advertise, offer to sell, or sell at wholesale or retail, cigarettes at less than cost to such wholesaler or retailer as the case may be."

It is clear that if the act is constitutional, the bill of complaint sufficiently alleges its violation by the appellant. It is equally clear that the demurrers interposed by the appellant raise the question of the equal protection of the law and the due process of law under the 14th Amendment of the Constitution of the United States, and also

the question of whether the Act is violative of the 1901 Constitution of the State of Alabama. In our opinion, the Act is constitutional and we so hold and sustain the decree of the lower court overruling appellant's demurrers.

In its decree overruling appellant's demurrer, Honorable Robert C. Giles states as follows:

" * * * The able brief and argument of the present respondent has not persuaded the undersigned to depart from the views expressed in the opinion in the prior case [Dominic Simonetti, Complainant, v. Joe M. Edwards, as Commissioner of the State Department of Revenue, et al., Respondents], a copy of which is attached to and by reference made part of this decree, and constitutes an appendix thereto."

As to certain features of the case, the opinion of the learned Chancellor so well expresses the views of this Court that we adopt the following portions of his decree:

"The present bill directly alleges a dual or cumulative specific intent to 'injure competititors *and* destroy or substantially lessen competition' and that respondent's advertising, offers to sell, and sale of cigarettes at wholesale have been 'at less than cost to said respondent.' These are considered to be allegations of ultimate, issuable facts, sufficient for the purpose of pleading, since the respondent's actual intent in fact, its costs, and its selling prices are presumably matters within its knowledge, and greater particularity would not seem to be required either to frame the issue or inform respondent of the charge against which it is required to defend. By these allegations, the State as complainant assumes a heavy burden of proof, since it must be proof of far more than mere intent of injury to competitors or 'unfairness' of competition. It must also prove, under the construction placed upon the Act, a selling below cost with the specific intent of destroying or substantially lessening competition, since the Act, if valid at all, can only be held so as an exercise of the police power of the state over intrastate commerce to the end of inhibiting practices tending toward monopolization.

"As to the grounds of demurrer asserting that Section III(a) deprives complainant of equal protection of the law and denies him due process of law contrary to the Fourteenth Amendment of the Constitution of the United States, the Court is of the opinion that the demurrer is not well taken. Such probably would have been the conclusion even prior to the 'new departures' in federal constitutional law of the last two decades. Rast vs. Van Deman [& Lewis Co.], 240 U.S. 342, 36 S. Ct. 37 [370], 60 L.Ed. 679.

"There is little room for doubt, indeed, since Nebbia vs. [People of State of] New York, 291 U.S. 502, 78 L.Ed. 940, 54 S.Ct. 505, 89 A.L.R. 1469. And see Great Atlantic & Pacific Tea Co. vs. Ervin [D.C.], 23 Fed. S[upp]. 70; Olsen vs. [State of] Nebraska, 313 U.S. 236 [61 S.Ct. 862], 85 L.Ed. 1305 [133 A.L.R. 1500], and Mora vs. Mejias [1 Cir.], 223 F.2d 814. In the Mora case, the First Circuit said that, insofar as the Fourteenth Amendment of the Federal Constitution is concerned, it is now undeniable that a state in the exercise of its police power may regulate the prices to be charged by an industry if its legislature determines that the public interest requires such regulation.

"The Robinson-Patman Act [15 U.S.C.A. §§ 13, 13a, 13b, 21a] prohibits sales at unreasonably low prices for the purpose of injuring and destroying competition. It would be unlikely that it would be held that the states, which have a general police power, could not similarly legislate upon a subject which Congress has so dealt with, under a police power merely concomitant with its delegated authority to regulate interstate commerce.

"It is noted that the demurrer raises no question as to a possible collision between

this Act and federal anti-trust legislation such as the Sherman Act [15 U.S.C.A. §§ 1–7, 15 note], under the Commerce and Supremacy clauses of the Federal Constitution.

"The question of the validity of the basic section of this legislation under the Constitution of Alabama, however, is a different and much more difficult matter. Many states have enacted legislation similar in principle. Varied and diverse conclusions have been reached by the courts of other states upon the validity of some of the auxiliary sections of these 'Below Cost Sales' Acts, and certain applications of the Acts have been held unconstitutional. See (e. g.) Cohen vs. Frey & Son (Md. 51) [197 Md. 586], 80 Atl.2d 267.

"The only decision which the Court has been able to find which strikes down the Act fundamentally and entirely is Williams vs. Hirsch (March 15, 1955—Georgia) [211 Ga. 534], 87 S.W.2d 70 [87 S.E.2d 70], which was made to turn upon a finding that the merchandising of cigarettes was not a business affected with the public interest. The opinion cites a decision wherein the Supreme Court of Georgia had previously held unconstitutional the Milk Control Board law of that state [Laws 1937, p. 247 as amended]. Harris vs. Duncan [208 Ga. 561], 67 S.E.2d 692. The essential validity of this sort of legislation seems to have been otherwise upheld without exception, where the sales below cost are only made unlawful when coupled with a specific intent to destroy competition. See the numerous cases cited in [Wholesale Tobacco Dealers Bureau v. National Candy & Tobacco Co., 11 Cal.2d 634, 82 P.2d 3] 118 A.L.R. 486, 506; [Commonwealth v. Zasloff, 338 Pa. 457, 13 A.2d 67] 128 A.L.R. 1120, 1126; 87 C.J.S. [Trade-Marks, Trade-Names, and Unfair Competition § 244 and § 245] p. 716, Sections 244 and 245.

"Article I of the Alabama Constitution of 1901 sets forth the Bill of Rights, and Section 1 declares:

" 'That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness.'

"The last two sections of the Bill of Rights are as follows: Section 35 provides:

" 'That the sole object and legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression.'

"Section 36 provides:

" 'That this enumeration of certain rights shall not impair or deny others retained by the people; and to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate.'

"Section 103 of Article 4 of the Constitution provides that:

" 'The legislature shall provide by law for the regulation, prohibition, or reasonable restraint of common carriers, partnerships, associations, trusts, monopolies, and combinations of capital, so as to prevent them or any of them from making scarce articles of necessity, trade, or commerce, or from increasing unreasonably the cost thereof to the consumer, or preventing reasonable competition in any calling, trade, or business.'

"In City [Council] of Montgomery vs. Kelly, 142 Ala. 552, 38 So. 67 [70 L.R.A. 209], the Bill of Rights of the State Constitution was considered to protect the right of the citizen to pursue any harmless occupation, and to conduct the business in his own way, so long as his manner of conducting his business did not offend public morals and work an injury to the public, *even though his methods of doing business might have a tendency to draw trade to him to the detriment of his competitors,* and the Court held that the City might not

impose a discriminatory license exaction upon a person employing trading stamps to advertise his business by the offering of such small 'gratuities.' No question of monopoly was involved, or of intentional injury to others. The ordinance merely sought to regulate competition and competitive methods of doing business as such.

"In State vs. Goldstein, 207 Ala. 569, 93 So. 308, 310, the Court only considered and held unconstitutional, as an abuse of the police power and offensive to the state Bill of Rights, that portion of the Act relating to the prevention and punishment of profiteering as defined in section 2 thereof [Acts 1919, p. 1088]. Of course the exaction of exorbitant prices for a commodity tends to invite, rather than stifle, competition, and the Court's opinion recognized the fact that the anti-profiteering provisions of the Act of September 30, 1919, were dissociated from such monopolistic situations as were dealt with in other portions of the legislation.

"Franklin vs. State, 232 Ala. 637, 169 So. 295, upholding the validity of the Milk Control Act [Gen.Acts 1935, p. 204], clearly illustrates the role of the quantity of 'affectation with a public interest; in price legislation. In that case, the Act expressly declared that the dairy industry was one affecting the public health and interest, and the Court states that it is a business affected with a public interest subject to regulation and control even to the extent of fixing prices, citing the Nebbia case, supra. However, this deci——— (sic) did not go to the extent of embracing the entire philosophy of the Nebbia case, as is shown by subsequent decisions of the Supreme Court of Alabama. It is significant that the opinion in the Franklin case, though quoting extensively from the Nebbia opinion otherwise, did not quote with approval that portion which has, in the federal courts and in the decisions of other state courts, served as the basis for much regulation of private business. In Nebbia, it was said 'the phrase affected with a public interest can in the nature of things mean no more than that

an industry, for adequate reason, is subject to control for the public good.' The writer rather thinks that the Franklin decision retained the earlier and narrower concept of affectation with a public interest, holding in effect that the importance of the dairy industry is such as to virtually constitute it a 'public utility.' And, of course, the regulatory consequences of affectation with a public interest are much broader than those imposed in a 'sale below cost' statute. When an industry falls within the doctrine of the Franklin case, maximum, minimum, or stated prices may be fixed, the method of conducting the business very closely regulated, and newcomers be prohibited from entering the field. It short, the legislature may regulate such a business in the same fashion that it does common carriers by motor truck, etc. If this case turned upon the question of whether or not the merchandising of tobacco was affected with a public interest, the law would probably be unconstitutional upon its face. But it would be an unusual idea to say that the power of the legislature over monopoly was limited to businesses affected with the public interest, and to say that the legislature may not prohibit one individual from deliberately injuring another individual who is in competition with him because their businesses happen to involve commodities of little importance to the public at large.

"In [City of] Mobile vs. Rouse, 233 Ala. 622, 173 So. 266, 11 A.L.R. 349, the Act [Gen.Acts 1935, p. 746], sought to confer upon municipalities power to fix minimum prices for the services of barbers and dry cleaners, with a view to prevention of 'ruinous price cutting' and prevention of widespread unemployment and economic distress. It was also sought to be justified as a measure for the protection of health, and for the purpose of coping with an economic emergency. It involved an outright fixing of prices, in terms of dollars and cents, under section 2 of the ordinance. The Court held the statute and ordinance unconstitutional as fixing prices for personal services

which were not affected with public interest. Presumably the prices to be fixed included an element of what was thought to be a 'fair profit.'

"Most important for consideration is the case of Alabama Independent Service Station Association vs. McDowell, 242 Ala. 242 [424], 6 So.2d 502, decided in 1942, long after the decision in the Nebbia and Franklin cases. It was a declaratory judgment at law involving the validity of an Act of 1939 [Gen.Acts 1939, p. 972], Section 1 of which required the posting of prices of gasoline and oil for motor vehicles, and Section 2 of which prohibited sale thereof except at the exact price posted, and prohibited discounts, premiums, or gratuities calculated to effect a sale of such products for other than the posted price. The act declared no legislative purpose to prevent monopoly and required no intent to injure or destroy competition. It in nowise undertook to fix prices, and apparently the dealers subject to it could fix any price whatsoever they chose upon the product so long as they posted same and sold for that exact price without the discounts or gratuities which were prohibited. As this Court understands the Act of 1939, a dealer might lawfully post a price of one dollar per gallon for gasoline in the morning and post a price of one cent per gallon in the afternoon of the same day and lawfully sell at such widely variant prices, though the first might be greatly excessive, and the second might be far less than cost. Judgment was not rendered on demurrer but after the taking of testimony, upon a complaint brought by dealers averring that they were actively competitive with certain of the defendants, and that it was greatly detrimental to plaintiffs to be required to comply with this statute while the competing defendants refused to comply therewith. The violation shown by the evidence was that the defendants were giving a dish or dishes of a value of more than one cent with each purchase of three or more gallons of gasoline, which dishes were not mentioned in the price posted upon the pump from which the sale was made.

Defendants asserted the federal and state unconstitutionality of the legislation. The Supreme Court noted that the Act discriminated against those who promoted their sales by the giving of premiums instead of national advertising programs. For the purpose of determining whether or not this decision is conclusive upon the validity of the Unfair Cigarette Sales Act, the opinion in the McDowell case makes the following most significant observation:

" 'It is clear from the evidence that advertising by posting and giving premiums by the independent dealer in no sense affects the general public welfare, but such advertising and trade practice is limited to sharpening competition between the dealers in nationally advertised products and independent dealers.' (6 So.2d 505.)

"The Court proceeded to hold that the merchandising of motor fuel was not a business affected with a public interest, that the legislation did not relate to the general welfare, but to the welfare of the particular class of dealers represented by the plaintiffs, that such class of legislation is outside the scope of the police power, and that section 2 of the Act violated sections 1 and 35 of the Constitution of Alabama 1901.

"This holding indicates to this Court that the Franklin case does not embrace the outermost extent of all the pronouncements contained in the Nebbia opinion. Certainly the merchandising of petroleum products is a matter which vitally affects our present 'civilization on wheels.' It would do little good to conserve the supply of milk in the public interest if it could not be collected, marketed, and delivered by motor vehicles. And certainly there would be more adequate reason for the legislature to regulate merchandising practices in the field of the petroleum industry than in the merchandising of cigarettes. For these reasons, the Court is of the opinion that the Act now under consideration cannot be sustained solely upon the theory that the business which it concerns is 'affected with a public

interest.' It is interesting to note that the Court in the McDowell case did not pronounce the Act invalid under the Federal Constitution, thus tacitly, perhaps, recognizing the divergence in the 'public interest' concepts exemplified in the McDowell and Olsen cases.

"In Lisenba vs. Griffin, 242 Ala. 679, 8 So.2d 175, the Supreme Court held that a municipal ordinance authorizing a board to fix minimum prices for the services of barbers was void, that the City was without authority to declare the business to be affected with a public interest, such being inconsistent with the general law, and that it undertook to regulate a private business contrary to Section 1 of the Alabama Constitution 1901.

"In Alabama Independent Service Stations Association, Inc., vs. Hunter, 249 Ala. 403, 31 So.2d 571, decided in 1947, our unanimous Supreme Court, through the opinion of Mr. Justice Lawson, again held the gasoline premium and discount statute unconstitutional, it having been reenacted without substantial change subsequent to the McDowell decision. The submission was on application for injunction contained in the sworn bill, apparently without any other evidence, and the appeal was from the denial of the injunction. The complaint was that respondent sold gasoline to members of an association at a discount of two cents per gallon less than the posted price, and lubricating oil at five cents less than the posted price, that the violations were numerous, and constituted unfair competition. The Court reaffirmed the holding of the McDowell case to the effect that such legislation is outside the scope of police power inasmuch as operation of filling stations is not a business affected with a public interest to the extent that the legislature may regulate the price at which gasoline and oil must be sold. The Court held that the prohibition of discounts contained in section 2 of the 'Gasoline Act' [Code 1940, Tit. 2, § 425(2)], was equally invalid with the prohibition of giving of premiums, etc. While the complainants complained gener-

ally of 'unfair competition,' there is nothing to indicate that the respondent's practice amounted to anything more than the giving of quantity discounts. In other words, it seems to have been 'competitive' rather than 'destructive' price cutting.

"The Court conceives that there is a substantial and determinative difference between the 'price posting' legislation of the McDowell and Hunter cases, and the 'sales below cost' legislation now presented. The McDowell opinion cites, to the proposition that such legislation was outside the scope of the police power, New Jersey, Massachusetts, Michigan and Connecticut decision, courts of three of which states have subsequently taken a different view of 'sales below cost' statutes.

"In Lane Distributors vs. Tilton et al. [7 N.J. 346], 81 A.2d 786 (1951), the Supreme Court of New Jersey, though striking down the Unfair Cigarette Sales Act [N.J.S.A. 56:7–1 et seq.] because of the invalidity of an inseparable section, clearly considered that the Act was not a price-fixing statute, and was essentially free of constitutional objections, stating:

" 'We would have no hesitancy in holding the Unfair Cigarette Sales Act constitutional were its provisions setting up the different categories not arbitrary and discriminatory.'

"In Fournier vs. Troianello [332 Mass. 636], 127 N.E.2d 167 (1955), the Supreme Court of Massachusetts upheld the Act [M. G.L.A. c. 93 §§ 14E–14K] prohibiting the sale at retail of *any* item of merchandise at less than cost with the intent to injure competitors or destroy competition, distinguishing the McBride case [Sperry & Hutchinson Co. et al. v. McBride et al., 307 Mass. 468, 30 N.E.2d 269, 131 A.L.R. 1254] (cited in the McDowell opinion) with the bare statement that 'the case before us is obviously quite different.'

"As to Michigan, a divided court [People v. Victor, 287 Mich. 506, 283 N.W. 666, 124 A.L.R. 316] held unconstitutional Section *6*

of Michigan Act No. 282, 1937, which section forbade the giving of premiums in connection with retail sales of gasoline for the purpose of injuring or destroying competitors, and this case is cited with approval in the McDowell opinion. But it is interesting to note that the same Michigan enactment, in Section 4, also prohibited *sales below cost* of bakery and petroleum products with intent to injure or destroy the business of a competitor, and is apparently still the existing statutory law of Michigan and has not been brought before the Supreme Court of that state for review in the more than eighteen years of its existence.

"And as to Connecticut, in Carroll vs. Schwartz, et al. [127 Conn. 126], 14 Atl.2d 754, the Supreme Court of Errors of Connecticut upheld the basic provision of an Act prohibiting sale of any item of merchandise at less than cost with intent to injure competitors or destroy competition [Gen.St.Supp.1939, §§ 922e–924e]. This case makes no reference to the Connecticut case of Miller, [State v. Miller, 126 Conn. 373] 12 Atl.2d 192, cited in the McDowell opinion.

"One of the early and leading cases upholding the validity of a statute prohibiting 'sales below cost' with injurious intent was a decision of the Supreme Court of California in Wholesale Tobacco Dealers [Bureau] vs. [National] Merchants Candy & Tobacco Co., (1938) [11 Cal.2d 634] 82 Pac.2d 3, 118 A.L.R. 486. Yet in State Board of Dry Cleaners vs. Thrift-D-Lux Cleaners (1953) [40 Cal.2d 436, 254 P.2d 29], the Supreme Court of that state held unconstitutional an act conferring upon a state board power to fix minimum prices in the cleaning and dyeing industry [West's Ann.Bus. & Prof. Code, §§ 9560–9567]. This opinion is fairly illustrative of the difference between the two types of legislation, and is valuable in demonstrating the points of comparison and of difference between 'Below Cost Acts,' consensual 'Fair Trade Acts,' and outright legislative price fixing in businesses not affected with a public interest. It is inter-

esting to note, in this connection, that we have had a 'Fair Trade Act' in Alabama since 1939. Code 1940, Title 57, Sections 77 through 83, inclusive.

"It is somewhat difficult to see how the legislature can lend governmental sanction to price maintenance of trademarked or branded merchandise, which price may include substantial profits, and may not, in the exercise of the police power and as an anti-monopoly measure, prohibit sales below cost with intent to destroy competition. Of course, so far as the writer can ascertain, our fair trade statute has not been considered by our Supreme Court, and is in no sense involved in the present case, and no opinion whatever with reference to its validity is intimated.

"It is necessary to consider whether or not prohibition of intentionally destructive sales below cost is reasonable related and adapted to the declared purpose and intent of the Act to prevent monopoly. It would seem that it is. For many years, the Robinson-Patman Act has prohibited sales at unreasonably low prices for purposes of injury to competition, as part of the Federal System of 'anti-trust' legislation.

"In Tooke and Reynolds vs. Bastrop Oil [Ice & Storage] Co. [172 La. 781], 135 So. 239, the Louisiana Court held that the sale of ice at less than cost of manufacture in order to eliminate competition was actionable under the treble-damages provision of the anti-trust law of that state [Act No. 11 of 1915, Ex.Sess., § 16, LSA–R.S. 51:137].

"And the Supreme Court of Mississippi, in Memphis Steam Laundry [-Cleaners] vs. Lindsey [192 Miss. 224], 5 So.2d 227, has gone so far as to hold that deliberately injurious price-cutting below cost, to drive a competitor out of business, is actionable at common law and authorized recovery of punitive damages.

"Price legislation, including 'Below Cost Acts' and 'Fair Trade Acts,' has had a hectic career in the various states of the union. Once the principle is conceded, the appli-

cation often becomes extremely difficult as exemplified in the Cohen-Frey case, supra.

"Other difficulties and possible inconsistencies in juridicial treatment have also appeared in Louisiana and Florida. In addition to judicial difficulties, this legislation may possibly involve fallacies in economic and accounting theory, and business administration practice. It may possibly substitute an oligarchy of the trade association for the monopoly of the old-time 'trusts.'

"A critical and unsympathetic discussion is found in 57 Yale Law Journal, p. 391. And there have been instances where individuals have been enjoined in Federal Courts from actively participating in the operation of 'below cost' statutes under the Sherman Act. And it could possibly be that the cost-surveys provided for in this Act may become the equivalent of agreed price lists. Code of Ala., 1940, Title 57, Section 107, prohibits agreements to regulate or fix the price of any commodity to be sold within this state. Perhaps the anti-monopoly horse has been ridden off in two opposite directions at once. As to the operation of this sort of legislation with the Sherman Act, see Food and Grocery Bureau of Southern California, Inc., et al., vs. United States [9 Cir.], 139 Fed.2d 973.

"The validity of the Alabama Unfair Cigarette Sales Act has already been upheld in one of the Circuit Courts of this state (Jerry Hilliard vs. Edwards, Commissioner of Revenue, Montgomery Circuit Court decree of April 16, 1954), the learned and respected jurist who rendered that decree observing that the issue is legal and not economic, and that it was neither the function or prerogative of the court to express an opinion on the wisdom or policy of the statute, that being primarily for the legislature, the Court being limited in its inquiry to:

"1. Whether the subject of the legislation is within the police power, and

"2. Whether the means adopted to accomplish the result are reasonably designed to do so and have a real and substantial relation to the objective.

"This Court is of the opinion that there is a valid distinction between 'competitive price-cutting' and 'intentionally destructive' price cutting, for the purpose of application of our constitutional principles. One of the declared intentions of the legislature in this Act is to safeguard the public against creation of monopoly. Not only is that within the scope of police power, but the exercise of that power is affirmatively enjoined upon the legislature by Section 103 of the Constitution. The factual examples of the Lindsey and Bastrop cases vividly show that intentional and deliberate cutting of prices below cost has been and can be a technique or weapon of monopolization. This Court cannot say that the declared intent is so far removed from the prohibited practice as to make it a mere masquerade, upon and from the very face of the Act itself.

"But the Court is further of the opinion that, in a business not affected with a public interest, as that concept abides in the law of the State of Alabama, the legislature cannot regulate competitive pricing policies by declared standards of 'fair competition,' and undertake merely to umpire pricing practices with reference to such standards above the level of selling of commodities below cost with injurious intent in a business which may be susceptible of monopolization within a community.

"If mere 'injury' to competitors were to serve as the basis for invoking the police power over prices, and was the only basis for the Act's operation, it would not be constitutional under our cases. All competition is intentional and all competitors necessarily injure all other competitors in the same field, except in rare cases of unrestricted and totally elastic markets. Competition is a struggle to win. Whatever one does to attract customers to him, in inelastic markets, is necessarily 'injury' to others in the field. To set a criterion of cost does not help the situation. Whether

a price cutter sells below cost of acquisition, or below that plus the cost of doing business, or below both these costs plus a profit so small as to scarcely yield a living for himself and his family, some injurious result would accrue to competitors who feel that they have a right to expect a reasonable profit. When a merchant air conditions ·or remodels his store, or provides parking, ·or exceptionally pleasant treatment for his ·customer, or more liberal credit than is or- ·dinarily extended, it is done, in a loose sense, to 'injure' competitors, who cannot ·or will not meet these conditions, though such merchant be a man of however much good will.

"The giving of trading stamps in the Kelly case, the giving of dishes in the Mc- Dowell case, and the giving of discounts in the Hunter case, were intentionally done. The natural and probable consequence of those practices was to attract patronage away from competitors and thus injure them. And the plaintiffs in the McDowell and Hunter cases alleged that they were being injured by unfair competition. If the police power included prohibition of price ·cutting solely for the prevention of injury ·to competitors as such, without the prohibition being further related to an intent to destroy or substantially lessen competition and thereby tend to monòpoly, then it would seem that the 'gasoline price posting Acts' would have been sustainable on that the- ·ory. And if the legislature could prohibit price cutting solely to conserve fair competi- ·tion as an end in itself, then it would not need to confine its prohibition to sales be- low cost, but could extend it to sales which ·would yield unreasonably low profits, which ·would most likely be considered unfair selling, and which would have the tendency ·to injure competitors, or at least work a hardship upon them.

"The Court is not required to regard with ·enthusiasm and without dubiety the entry of what might ultimately turn out to be ·the nose of the price-fixing camel within the State constitutional tent. But questions ·of the wisdom, necessity, propriety, effi- ciency, practicability, consistency, economic actuality and policy, and soundness of leg- islation are primarily for the legislature. And if the question of adaptation of means to purpose is debatable, the Court will not undertake to say as a matter of law that it does not exist. Will the Act have, in prac- tical operation, an end-result of price fix- ing? Is it fairly enforceable? Prediction is beyond the function of the Court. There have been some peculiar applications of price and price-maintenance legislation.

"In Remington Arms [, Inc.] vs. Berger [, Inc., 208 Misc. 561], 144 N.Y.S.2d 751, a dealer in brand-named ammunition, who had purchased a quantity of it at a dis- count at a closeout sale, was required to sell it at no less than what he regarded as an exorbitant profit.

"In Trade Comm. vs. Bush (Utah) 1953 [123 Utah 302, 259 P.2d 304], C.C.H. Trade cases, p. 60, 601, the merchant who gave trading stamps, and was sued under a 'be- low cost' Act, prevailed in his insistence that his only intent was to increase his own business, and not to harm anyone, 'frankly admitting we all know—that any sales in- crease *be* enjoyed of necessity reduced the sales of another or others.'

"In Bristol Myers vs. Picker [302 N.Y. 61], 96 N.E.2d 177, 22 A.L.R.2d [1203] 203, which was like Remington under the New York consensual Fair Trade Act [Gen- eral Business Law, McKinney's Consol. Laws, c. 20, §§ 369–a to 369–e], the Court of Appeals of that State wrestled with the problem of whether or not the giving of redeemable cash register slips constituted a violation when much less tangible 'gratui- ties' such as parking the customer's car, minding his infant, and furnishing him with entertainment, were not violations.

"In United [Retail] Grocers' Association vs. Harrison['s Sons, Inc.], 89 District and County 294, the Pennsylvania Common Pleas held not violative of a 'below cost' statute, the giving of five pounds of free sugar with purchases, under an Act con- taining no provision such as Section V of the Alabama Unfair Cigarette Sales Act."

To sum up the views of the Court, the following conclusions are set forth:

"1. Under the Kelly-Hunter line of decisions in this state, the legislature cannot, consistently with Sections 1 and 35 of the State Constitution, regulate competitive prices or prohibit bona fide competitive price cutting in businesses not affected with a public interest, merely in the interest of fairness in competition.

"2. The legislature may, however, exercise the police power of the state to inhibit creation of monopolies, whether the business concerned is affected with a public interest or not.

"3. The selling of cigarettes below cost with intent to injure competitors and thereby destroy or substantially lessen competition may be a practice which tends toward creation of monopoly, and is within the police power of the state whether or not the business be affected with any public interest as such.

"4. The Court cannot say, as a matter of law, on demurrer, that the provision contained in the first sentence of Section III(a) of the Unfair Cigarette Sales Act is unconstitutional, null and void, upon its face.

"5. In order for the Act to fairly subserve the purpose of inhibition of monopoly, as distinguished from the purpose of merely procuring 'fair' competitive prices as an end in itself, the Act must be construed so as to require the dual, conjunctive, or cumulative intent to injure competitors *and* destroy or substantially lessen competition.

"In other words, where the comma occurs between the words 'competitors' and 'destroy' in the first sentence of Section III(a) the conjunctive 'and' must be understood. Otherwise, the Act would fall within the influence of the principles of the Kelly-Hunter cases, having an independent alternative based on mere injury to competitors, without more.

"If the phrase 'To injure Competitors' is disjunctive from and alternative to the phrase 'destroy or substantially lessen competition,' then a violation could be predicated upon an intent to attract a single customer from a single competitor, without reference to that substantial lessening of competition which is the very essence of monopolistic tendency, or else a paradox would arise which would say in effect that all competition tends toward monopoly. If an intent to injure a competitor were alone sufficient, then the additional phrase 'destroy or substantially lessen competition' would be entirely redundant. The Court is of the opinion that there is an important difference between mere injury to a competitor and a destruction or substantial lessening of competition, and that they are not alternative or equivalent, and that the Act must be construed to require the intent to do both, rather than either."

Research discloses that in 38 jurisdictions of the United States which have enacted such laws (some applying to all products generally, others applying to one or more products), the courts have been practically unanimous in affirming the principles of these laws against constitutional attack. The following states have upheld the validity of sales below cost laws: Arizona, California, Colorado, Connecticut, Iowa, Kansas, Kentucky, Louisiana, Massachusetts, Minnesota, Montana, Nebraska, New Hampshire, New Jersey, Oklahoma, Tennessee, Washington, Wisconsin, Wyoming. (The reporter will set out in the report of the case the cases from these jurisdictions appearing in the Amicus Curiae brief.)

Since Judge Giles' last decree, the United States Supreme Court handed down its decision, Safeway Stores, Inc. v. Oklahoma Retail Grocery Ass'n, Inc., 360 U.S. 334, 79 S.Ct. 1196, 1201, 3 L.Ed.2d 1280, at page 1285, upholding the constitutionality of the Oklahoma Unfair Sales Act, 15 O.S.1951

§§ 598.1–598.11, which was attacked on the grounds of violating the Fifth and Fourteenth Amendments of the Federal Constitution, and the Court there said:

"One of the chief aims of state laws prohibiting sales below cost was to put an end to 'loss-leader' selling. The selling of selected goods at a loss in order to lure customers into the store is deemed not only a destructive means of competition; but it also plays on the gullibility of customers by leading them to expect what generally [was] not true, namely, that a store which offered such an amazing bargain was full of other such bargains."

It should be pointed out that since the demurrer of appellant is to the bill as a whole, if any ground for relief, as pleaded, is sufficient, then the demurrer addressed to the bill as a whole was properly overruled, even though other aspects, if any, might be defective. We are of the opinion that the court ruled correctly in stating that the bill had equity and in overruling the demurrer of appellant. Stone Container Corp. v. Stapler, 263 Ala. 524, 83 So.2d 283; Bell v. Killian, 256 Ala. 24, 53 So.2d 604; Alabama State Milk Control Board v. Graham, 250 Ala. 49, 33 So.2d 11; Tyler v. Copham, 245 Ala. 151, 16 So.2d 316.

We think the bill sufficiently charges a violation of Sec. III(a) of Act 805, Acts of Alabama 1951, effective Sept. 11, 1951, now appearing in Pocket Part of the Code of Alabama 1940 as Sec. 83(1) through (14) of Title 57, and hold that the trial court correctly overruled the grounds of demurrer properly assigned and argued.

We are not to be understood as holding that all of the provisions of the Act are constitutional because the validity of all the provisions of the Act are not here challenged.

The cause is affirmed.

Affirmed.

All the Justices concur except COLEMAN, J., who dissents.

COLEMAN, Justice (dissenting).

I do not disagree with the broad constitutional principle that the legislature has power to prevent monopolies. In the light of that principle, it may well be that the first sentence of Section III(a) of Act No. 805, 1951 Acts, p. 1402, is not, on its face, violative of any constitutional provision.

The bill of complaint here under attack, as I understand it, seeks far more than a mere declaration that the first sentence of Section III(a) is constitutional on its face. I do not understand how it can be said that the bill sufficiently alleges violation of the statute by appellant, and shows that complainant is entitled to the injunction prayed for, on the bare holding that the first sentence of Section III(a) of the Act is not unconstitutional on its face.

As it appears to me, the respondent, in this Court at least, has, by appropriate demurrer and argument, challenged certain sections of the statute. I am not able to agree that those sections meet the constitutional test and am of opinion that the decree overruling the demurrer is in error. Therefore, I respectfully dissent.