286 So.2d 866

**Bobby Joe ESTELL**

v.

**CITY OF BIRMINGHAM.**

**6 Div. 94.**

Court of Criminal Appeals of Alabama.

June 29, 1973.

Rehearing Denied July 26, 1973.

J. M. Breckenridge and William C. Walker, Birmingham, for appellee.

Rainey & Taylor, Birmingham, for appellant.

PER CURIAM.

Appellant was convicted in the lower court of violation of Sections 6–45 and 6–48 of the General Code of the City of Birmingham. On appeal to the circuit court the appellant filed a demurrer challenging the validity of the City's ordinance, which demurrer was overruled by the court. The parties then agreed to a stipulation of the

facts in the case, which stipulation was presented to the court in lieu of taking evidence in the case and the appellant was found guilty, from which judgment he has prosecuted this appeal.

The Sections of the Code of the City of Birmingham above referred to under which the appellant was charged and convicted are herein set out as follows:

"Whenever any theatrical performance, show, exhibition or entertainment of any name or nature is given at any hall, theatre or building licensed as a place of public entertainment, and for admission to which money is demanded or charged, if such theatrical performance, show, exhibition or entertainment is advertised by the proprietor or manager thereof or by the proprietor or manager of the theatre, hall or building in which the same takes place, in a newspaper published in the City, every such advertisement shall state the complete scale of prices for admission to such threatrical performance, show, exhibition or entertainment, and such scale of prices shall also be framed and hung up in some conspicuous place at the door, or in the lobby of the theatre, hall or building. It shall be unlawful for any person to sell or dispose of any ticket or seat for such theatrical performance, show, exhibition or entertainment at a higher price for admission thereto than is in accordance with the scale of prices so published, framed or hung up, and it shall also be unlawful for any person to sell or dispose of any ticket or seat for any such theatrical performance, show, exhibition or entertainment without such scale of prices having first been advertised and posted at the door or in the lobby of the theatre as above required." (Code 1944, § 1221, Birmingham City Code, § 6–45, pp. 82–83)

"It shall be unlawful for any person to purchase tickets to any theatrical performance, show, exhibition, baseball game, football game or other entertainment for the purpose of reselling the same, and it shall also be unlawful for any person to sell or offer for sale any such tickets for a greater price than the price for which such tickets were advertised or sold by the manager, or authorized ticket agent of the manager, of such performance, game or entertainment." (Code 1944, § 1225, Birmingham City Code, § 6–48, p. 83)

The Court feels that it is appropriate to set out the stipulation of facts entered into by the parties, upon which the court based the judgment of conviction. The stipulation provides as follows:

"On December 1, 1967, Officer N. G. Hopkins was in the vicinity of 5th Avenue and 20th Street North, Birmingham, Alabama, where after talking to a boy selling flags, he approached the defendant Bobby Joe Estell. The defendant was standing in front of the Tutwiler Hotel. Officer N. G. Hopkins asked the defendant if he had any tickets to sell. (Referring to tickets to the Alabama-Auburn football game.) The defendant replied that he did. Officer Hopkins then told the defendant that his buddy was coming and·he had the money. His buddy, fellow officer D. R. Trimm, walked up and then the defendant suggested they walk down 5th Avenue a little way. The three walked to a place near the southwest corner of 5th Avenue North and 21st Street where Officer Hopkins asked him how much he wanted for them. The defendant replied Twenty-Five Dollars ($25.00) a ticket. Officer Trimm asked the defendant if he had four together. The defendant pulled tickets from an envelope and after looking at them he found four together. The defendant handed the four tickets to Officer N. G. Hopkins and Officer Trimm handed the money to defendant, who reached out to take it and did touch it before Officer Trimm pulled the money back, identified him-

self as a police officer and arrested the defendant, taking all the tickets that the defendant had in his possession. The published price for such tickets or the price that the tickets were sold for by the manager, or authorized ticket agent of the manager was Six Dollars ($6.00) per ticket."

It appears from the record that the sole question before this Court is the constitutionality of Sections 6–45 and 6–48 of the Code of the City of Birmingham, supra. This challenge to the validity of the City ordinance is set out in appellant's assignment of error.

Specifically the appellant argues the ordinance in question violates the First and Fourteenth Amendments to the Constitution of the United States, and Article I, §§ 1, 22 and 23 of the Constitution of Alabama.

The question of the regulation by a statute or municipal ordinance of the sale of tickets to football games, theatres, shows and various amusements has not been considered by the appellate courts of Alabama, but has been the subject of decision by the U. S. Supreme Court and the appellate courts of several states (Texas, Indiana, Illinois, New York and Pennsylvania).

In the New York case of Tyson & Bro. v. Banton, 273 U.S. 418, 47 S.Ct. 426, 71 L.Ed. 718, the Supreme Court of the United States held as unconstitutional a state statute limiting the profit on the resale of each theater ticket resold by brokers to fifty cents, as "not affected with the public interest" and hence an unreasonable extension of the police powers and violative of the due process clause of the Fourteenth Amendment.

The Supreme Court, in Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, effectively overruled *Tyson*, supra, in sustaining a state statute regulating the price at which milk might be sold and recognizing the dairy interest as affected with the public interest and subject to the exercise of the police power of the state in an expanding economy and an increasingly interdependent society.

"The lawmaking bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. [Public Service Comm. v. Great Northern Utilities Co., 289 U.S. 130, 53 S.Ct. 546, 77 L.Ed. 1080] If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty.

"Tested by these considerations we find no basis in the due process clause of the Fourteenth Amendment for condemning the provisions of the Agriculture and Markets Law here drawn into question."

The United States Supreme Court thus recognized the broad general principle that under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The Court there also states:

" . . . But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest. . . . . "

"The phrase 'affected with a public interest' can mean no more than that an industry for adequate reason, is subject to control for the public good . . . "

In Franklin v. State, 232 Ala. 637, 169 So. 295, the Alabama Supreme Court in affirming the validity of a state statute creating a state milk board with the power to control production and set minimum and maximum prices for the sale of milk, generally followed *Nebbia*, supra, in the more strict interpretation of "public interest" and "police powers." There our Supreme Court in *Franklin*, supra, said:

"There can be no serious doubt but that the business of producing and selling milk to the general public, as contemplated in the act, is a business that vitally affects the public. It is a business affected with a public interest, which is tantamount to saying 'subject to the exercise of the police power,' and to regulation and control, even to the extent of fixing prices. Nebbia v. New York, supra."

In Simonetti, Inc. v. State, 272 Ala. 398, 132 So.2d 252, the Alabama Supreme Court affirmed the validity of the Unfair Cigarette Sales Act (Act No. 805, Acts of Alabama 1951, effective September 11, 1951) that forbade any wholesaler or retailer under certain circumstances from, among other prohibitions, selling cigarettes at less than cost with intent to injure competitors.

" 'Franklin v. State, 232 Ala. 637, 169 So. 295, upholding the validity of the Milk Control Act [Gen.Acts 1935, p. 204], clearly illustrates the role of the quantity of "affectation with a public interest; in price legislation. In that case, the Act expressly declared that the dairy industry was one affecting the public health and interest, and the Court states that it is a business affected with a public interest subject to regulation and control even to the extent of fixing prices, citing the Nebbia case, supra. However, this deci— (sic) did not go to the extent of embracing the entire philosophy of the Nebbia case, as is shown by subsequent decisions of the Supreme Court of Alabama. It is significant that the opinion in the Franklin case, though quoting extensively from the Nebbia opinion otherwise, did not quote with approval that portion which has, in the federal courts and in the decisions of other state courts, served as the basis for much regulation of private business. In Nebbia, it was said "the phrase affected with a public interest can in the nature of things mean no more than that an industry, for adequate reason, is subject to control for the public good." The writer rather thinks that the Franklin decision retained the earlier and narrower concept of affectation with a public interest, holding in effect that the importance of the dairy industry is such as to virtually constitute it a "public utility." And, of course, the regulatory consequences of affectation with a public interest are much broader than those imposed in a "sale below cost" statute. When an industry falls within the doctrine of the

Franklin case, maximum, minimum, or stated prices may be fixed, the method of conducting the business very closely regulated, and newcomers be prohibited from entering the field. In short, the legislature may regulate such a business in the same fashion that it does common carriers by motor truck, etc. If this case turned upon the question of whether or not the merchandising of tobacco was affected with a public interest, the law would probably be unconstitutional upon its face. But it would be an unusual idea to say that the power of the legislature over monopoly was limited to businesses affected with the public interest, and to say that the legislature may not prohibit one individual from deliberately injuring another individual who is in competition with him because their businesses happen to involve commodities of little importance to the public at large.' "

It is thus clear in *Simonetti,* supra, that the Alabama Supreme Court did not adopt in its entirety the *Nebbia* doctrine in its holding in *Franklin,* supra, but adhered to a more narrow standard; namely, "affectation with a public interest" to the extent of finding the dairy industry virtually a public utility and thus amenable to statutory regulation. *Simonetti* cites and reviews many Alabama cases concerned with price fixing.

State v. Goldstein, 207 Ala. 569, 18 Ala. App. 587, 93 So. 308, held unconstitutional an act prohibiting the sale of commodities, food, clothing, fuel and other necessities of life, at grossly excessive prices as violative of the Fourteenth Amendment to the Constitution of the United States and of the guarantees and declarations of the Constitution of Alabama, 1901.

In *Goldstein,* supra, the Court quoted extensively from People v. Steele, 231 Ill. 340, 83 N.E. 236, which case held unconstitutional a statute prohibiting the sale of a ticket by the manager of a theatre without carrying on its face a restriction against its resale at an advance, and prohibiting such a resale, or keeping a place or carrying on such a business. The Court held the statute to be an unreasonable, arbitrary interference with the right to conduct a private business and not of such character to be subject to regulation by the police power.

The Indiana case of Kirtley v. State, 227 Ind. 175, 84 N.E.2d 712, struck down a statute substantially the same as the one before the Court here, as being in violation of the personal liberty clause of the Indiana Constitution.

The Texas case of Humphrey v. State, 152 Tex.Cr.R. 203, 212 S.W.2d 159, is not an apt authority here since it dealt with a violation of a statute requiring a license for the sale of tickets to amusements for an advance price over the original one.

The ultimate question, therefore, in this case is whether or not the regulation of the sale of tickets to the annual Alabama-Auburn football game and the other public entertainments for which tickets may be sold by a scalper on the streets of Birmingham, is so affected with the public interest and of such importance as to be the subject of price fixing regulation under the police power of the City of Birmingham.

It is our opinion that the ordinances in question in the case at bar, even though ostensibly attempting to protect the public interest, in fact transcend the limits of the police power, and constitute an arbitrary interference with private business by imposing unusual and unnecessary restriction upon a lawful occupation. We, therefore, hold the ordinances void and the conviction of appellant based thereon is reversed and the cause remanded.

The judgment below is hereby

Reversed and remanded.

CATES, P. J., and ALMON, J., concur.

HARRIS, J., concurs in the result.

TYSON and DeCARLO, JJ., dissent.

CATES, Presiding Judge (concurring).

A court should not be a disputatious forum for the debating and resolving of questions within the realm of Political Economy. The discrepancies between Adam Smith and Lord Keynes may illustrate but should not control legal controversies.

Here, if we adopt the dissent of Brandies in New State Ice Co. v. Liebmann, 285 U.S. 262 at 302–303, 52 S.Ct. 371, 76 L.Ed. 747 then I cannot see how sporting events—at least as to the *resale* prices— reasonably require regulation for the public protection.

To adopt the views of my Brother Tyson would mean that the Legislature could set (high or low) the prices for Alabama or Auburn tickets, the coaches' salaries, working hours, recruitment inducements, scholarships, even—by contract—the post graduation bonuses received by the players, earned by playing for one of our egregious public universities. The Legislature would enter the Wonderland of deciding, for example, whether 10%, 20%, 50% or any other fraction of all the football tickets shall be reserved for Boy or Girl Scouts, Disabled Veterans, retired ministers of the gospel or rabbis, parents of teen age prospective players, alumni or any other appropriate group within a reasonable classification.

Scalping in the environs of a gladiatorial arena no doubt can be a public nuisance and hence the City of Birmingham has the power to suppress it. But to prevent an otherwise honest profit is not in my way of thinking regulating a nuisance.

Perhaps bread and circuses may become a staple of American life. Autumn (and early Winter) television tends to this conclusion.

If, in the necroptic dissection of Tyson & Brother v. Banton, 273 U.S. 418, 47 S. Ct. 426, 71 L.Ed. 718, we advert to Mr. Justice Stone's prophetic dissent in Ribnik v. McBride, 277 U.S. 350, 48 S.Ct. 545, 72 L.Ed. 913, then I feel it is certain that we cannot say that the profitable reselling of football tickets reflects "any combination of circumstances [which] seriously curtails the regulative force of competition so that buyers or sellers are placed at such a disadvantage in the bargaining struggle that a legislature might reasonably anticipate serious consequences to the community as a whole."

A football game can, of course, by the owner or renter of the stadium be made into a social affair with engraved invitations, formulas of repondez-s'il-vous-plait and a prohibition against gate crashers and other non-invitees. I think we can take notice that this effeteness of the days of Lester De Pester has imitated the Bedouin who folded his tent and silently stole away.

Finally, in this day of worry about urban crime I think that it is a poor allocation of the manpower of the Birmingham constabulary to root out grifters peddling football ducats on the main street of the city.

I firmly adhere to the majority opinion and have written this to—hopefully—reinforce it.

TYSON, Judge (dissenting).

Most respectfully, I dissent. This writer cannot equate the regulation of the sale of athletic tickets to the premiere athletic event between our two largest State supported institutions with the regulation of privately owned and operated sales of tickets to other types of public amusements.

Auburn University and the University of Alabama are without question the two largest, best known educational institutions in Alabama, and for many years have served a substantial segment of the population of this State by providing higher educational opportunities for our people. Literally, millions of dollars of public revenue have been invested in each of these fine

institutions. Our Legislature appropriates vast sums for the operation of each school annually.

Of importance is the athletic program at both schools. The athletic program at each school is largely, if not totally, supported by the gate receipts from the sale of tickets to football athletic contests. This has been the policy for many years at both schools, and is widely recognized as effectuating substantial savings to the taxpayers of this State. Tickets from both institutions are made available for sale to the general public each year. Also, annually, football tickets are sold for both Auburn University and the University of Alabama through the Parks and Recreation Board of the City of Birmingham, Alabama. Moreover, the site of these football contests in Birmingham, Alabama, is at Legion Field, which is a publicly owned athletic stadium. Considerable time and effort are required on the part of the personnel of the City of Birmingham to regulate and effect the traffic flow to and from the site of these athletic contests. Other personnel of the City of Birmingham are regularly involved in maintaining order at the site, and, indeed, throughout the City, caused by the heavy influx of interested persons coming to such athletic contests.

All of the foregoing factors point up a self-evident truth, namely, that the total education of individuals today through our publicly owned institutions of higher learning, is a matter concerned with the development of the complete person. This is to say that such educational institutions are, and should be, not only concerned for the well-being of their students as to their academic pursuits, but also of their moral activities, spiritual aims, and athletic prowess as well. Because of these factors, it is clear that the regulation, therefore, of the price of tickets to such athletic contests between our two premiere institutions of higher learning of this State necessarily is a matter of enormous public interest. As such, it might be deemed a "publicly owned business affected with a public interest."

If we were here presented with a question involving the regulation by the City of Birmingham of the sale of tickets to a musical concert or theatrical performance by privately sponsored groups, through a privately owned ticket agency, or to the sale of tickets to an athletic contest between professional teams, involved in some sports event, a different approach to this matter might be necessitated. However, such are not the facts of this case.

Indeed, we are here squarely presented with the question involving the regulation of the unlawful sale of athletic tickets between our two largest institutions of higher learning, to the premiere athletic event in the State of Alabama. There is no other single event in this State which annually attracts crowds of seventy thousand or more. Such has been true for a number of years.

It is therefore clear that the regulation of the unlawful sale of athletic tickets between publicly supported educational institutions is necessarily "a matter affected with the public interest."[1] Any other position, in my judgment, as a matter of law, is fundamentally unsound.

DeCARLO, J., joins in this dissent.

---

1. "The management and control" of Auburn University is in its Board of Trustees. Article 14, Section 266, Constitution of Alabama 1901.

"The management and control" of the University of Alabama is in its Board of Trustees. Article 14, Section 264, Constitution of Alabama 1901.