Hugh H. Hogue et al.

*v.*

The Kroger Company et al.

356 S. W. 2d 267.

(*Nashville,* December Term, 1961.)

Opinion filed April 4, 1962.

2

GEORGE F. MCCANLESS, Attorney General, THOMAS E. Fox, Assistant Attorney General, Nashville, for appelants.

A. LONGSTREET HEISKELL, FRIERSON M. GRAVES, JR., Memphis, SHEPHERD, HEISKELL, WILLIAMS, WALL & KIRSCH, Memphis, of counsel, for appellees.

Mr. Justice Burnett delivered the opinion of the Court.

The Commissioner of Agriculture of the State of Tennessee sought an injunction against Hogue and Knott, a retail grocery store in Memphis, Tennessee, for selling milk at less than cost with the intent to unlawfully divert trade from their competitors in violation of Chapter 203, Public Acts of 1961, which is codified under sec. 52-331 to 52-334, inclusive, T.C.A. This Act is generally referred to as the Milk Act. The injunction was denied by the Chancellor and the Commissioner has appealed. Thus it is that our only question under the present record is whether or not the Chancellor erred in denying the injunction sought by the Commissioner.

Hogue and Knott filed an original bill against the Commissioner of Agriculture, the Attorney General of the State and various and sundry other retail stores in Memphis in which they sought a declaratory judgment as to their rights under the Milk Act. This bill is sworn

4

to by them. This bill insofar as here necessary to state was answered by the Commissioner of Agriculture, and, along with his answer, he filed a cross-bill in which he sought an injunction enjoining Hogue and Knott from selling milk at less than cost. None of the other grocery stores in Memphis was made party defendants to this cross-bill, and no action was sought by the Commissioner against them.

The bill of Hogue and Knott alleged that they in reducing prices were in good faith attempting to meet the prices of their competitors by reducing the dollar and cent price of milk by an amount equal to the value of trading stamps distributed by their competitors.

To this cross-bill of the Commissioner, Hogue and Knott likewise filed a sworn answer along with their affidavit showing that their reduction in the price of milk was in an amount equal to what their competitors were doing when they gave trading stamps. The affidavit showed in many instances the giving of these trading stamps would reduce the price in milk two cents on the dollar or more, depending upon the size of the sale, that is, the amount in dollars and cents considered along with the cost of the product, and that thus their reductions were exactly what the reduction in price would be if they gave trading stamps as their competitors did.

On this cross-bill, the original bill of Hogue and Knott, and the answer to the cross-bill the questions herein were determined.

 The Commissioner questions the right of a retailer, and particularly Hogue and Knott, to sell milk at a price fixed by his competitors reduced by the amount

equal to the value of trading stamps distributed by the competitors. The Act, sec. 52-332, T.C.A., says that no distributor shall sell milk for less than cost to the processor and distributor. The term "cost to the retailer" is defined under sec. 52-331(1) (n) of the Act and the preceding subsection of (m) sets out any number of things that may be included in the expenses for overhead for his operation. Subsection (n) says though that without specific evidence of the cost of doing business, that for standard service this overhead cost shall be eight (8%) per cent. The statute thus provides for a specific mark-up to eight (8%) per cent over the cost to the seller and forbids sales at any lower price.

In the last paragraph of this subsection (n) the Legislature has provided that this cost of doing business includes "the fair value of any concession of any kind whatever which has the effect of reducing the actual sales price or increasing the cost of the goods delivered * * * *including* but not limited to *the cost to the retailer of trading stamps* or redeemable coupons." Thus as we see it the clear intent of the Legislature was to include within this eight (8%) per cent for overhead the cost of trading stamps. The trading stamp user and the non-trading stamp user were put on an equal footing. When there is no evidence to the contrary, and it is shown that a retailer is giving these trading stamps he thus is in violation of the Act in cutting the price of milk below the cost to him plus eight (8%) per cent for whatever the trading stamps cost him, as hereinbefore referred to. It was to meet this overage of eight (8%) per cent that the competitors in Memphis of Hogue and Knott were spending, that is money for trading stamps, when they

attempted according to their sworn bill in good faith to cut the price of their milk to meet this competition.

Apparently the Commissioner takes the opposite view regardless of the statute, because he says and considers that trading stamps should be treated as a discount for cash rather than as a reduction in the price of the milk sold. Under this concept it has been held that a statute permitting sales below cost has not been violated by a sale at no less than the cost established under the applicable statute, even though the customer also receives such stamps, the stamps being regarded as the equivalent of a discount for cash rather than as a reduction in price of the article sold. *Safeway Stores, Inc. v. Oklahoma Retail Grocers,* Oklahoma Supreme Court, 322 P.2d 179, 70 A.L.R.2d 1068, affirmed by the Supreme Court of the United States, 360 U.S. 334, 79 S.Ct. 1196, 3 L.Ed.2d 1280. We think though, as did the Chancellor, that this stamp cost is an element of the cost of doing business, and the Legislature, pursuant to its specific enactment above quoted, intended that these stamps should be included in the cost of doing business and in the eight (8%) per cent mark-up. As said above, the statute allows the invoice price and many things in doing business which are fixed at an arbitrary eight (8%) per cent. This language of the statute, we think, must include the cost of these stamps, therefore when stamps are used above this eight (8%) per cent arbitrary figure, the retailers thus giving these stamps are in violation of the statute.

The Chancellor reached the conclusion that in view of the attempted enforcement by the Commissioner against Hogue and Knott and not at the same time attempting

an enforcement against these other grocers who were before him in the instant case that the cross-bill showed that there was an attempt to enforce the statute against one party while not attempting to enforce it against another and thus the enforcement sought in this way was violative of Article 1, Section 8, and Article 11, Section 8, of the Constitution of Tennessee, which in effect requires that all persons shall be treated alike under like circumstances and conditions, both in privileges conferred and in liabilities imposed. *Mascari v. International Brotherhood of Teamsters,* 187 Tenn. 345, 215 S.W.2d 779.

There is another very sound reason under the pleadings here why the injunction should be denied. Sec. 52-334(7), T.C.A., provides that:

"The provisions of sec. 52-332 shall not apply to advertisements or offers to sell, or sales where:

&ast; &ast; &ast; &ast; &ast; &ast;

"(7) the price of such items is made in good faith to meet competition, provided that such prices shall not be cut more than once, nor in any event cut below the price of competition."

We must remember that here we have a sworn bill of Hogue and Knott that they only cut their prices in such an amount as the cost of the trading stamps were to their competitors and that they were doing so in good faith. It seems to us that a very reasonable interpretation of this provision (sec. 52-334[7], T.C.A.) is that a retailer may reduce his price once for each price change of his competition. If this were not true the price would be frozen. The Chancellor considered under matters

before him and under the complaint of the cross-bill of the Commissioner that Hogue and Knott had done what they did in good faith to meet competition and having reached this conclusion he thus under his discretion denied the temporary injunction.

■ ■ The Commissioner argues that this was not done in good faith but that Hogue and Knott are legally wrong and therefore are violating the statute. They rely particularly on *Safeway v. Oklahoma Retail Grocers,* supra. The Oklahoma case though is not authority for this proposition. In the Oklahoma case an injunction had been denied in the lower court to enjoin a grocery store from giving trading stamps. This was upheld by the Supreme Court. The Supreme Court affirmed the lower court in granting an injunction against Safeway wherein it was cutting prices to meet Speed's cost of trading stamps, because the acts practiced by Safeway were not in good faith but were in retaliation of a retaliatory action. We have the opposite finding here and on this finding a very reasonable conclusion was reached by the Chancellor.

Under most of these unfair trade acts in the majority of the States provisions are contained exempting sales below cost made in good faith to meet the legal prices of competitors. Sec. 69-304(h), T.C.A. The various courts in interpreting similar acts where it is found below that they were made in good faith have sustained them. See *State of Minnesota, by Clark v. Wolkoff et al.,* 250 Minn. 504, 85 N.W.2d 401, where a number of authorities from other states are quoted from. See likewise *Trade Commission v. Bush,* 123 Utah 302, 259 P.2d 304. It must be remembered that the Act in question in the

instant case makes a violation of it a misdemeanor. Therefore, if Hogue and Knott by what they have done and if what they have said in their sworn petition is not true, they have in effect perjured themselves and made themselves liable to a fine. Certainly under the facts and circumstances as alleged here it is not shown that Hogue and Knott intended to violate the Act—clearly not beyond a reasonable doubt. When such is true, as said by the Utah Court in *Trade Commission v. Bush,* supra, "This court certainly will not ascribe to the oath-taker the infamy of a perjurious mind. We think, with every presumptive support, that people normally are honest and tell the truth."

This Act, sec. 52-331(2) (b), T.C.A., provided that proof of the commission of any act prohibited by Sections of this Act shall be *prima facie* evidence of unlawful intent, etc. This is merely establishing a *prima facie* case which if shown by the bill of the Commissioner seeking the injunction without more is taken just as any other statutory *prima facie* case of evidence. This is not a mandatory proposition on the Chancellor when and if proper evidence is shown to him to the contrary prior to the granting of the injunction. If this contrary evidence in his judgment does overcome such a presumption then he certainly should deny the injunction.

The presumption fixed by this statute is a rule of law which attaches to certain facts as set forth in the bill, but where evidence contrary to this presumption is offered the presumption disappears and the case stands upon the facts and whatever inferences may be drawn therefrom. Under the facts shown here by the sworn bill of Hogue and Knott in the first instance, their sworn

answer to the bill of the Commissioner and the affidavits attached thereto, they clearly rebut this *prima facie* presumption and thus the Chancellor considered it on this basis which was his duty and right. Mr. Gibson in the 5th Edition of his work, at sec. 395, states this rather plainly, that if a bill is met by a sworn pleading and affidavit before the injunction has been granted and these things meet the averments of the bill this will be sufficient and the *prima facie* right to the injunction is overcome. To quote a portion of this section of Gibson, ''especially when (1) it is to be used to resist the granting of an injunction prayed for, but not yet allowed; * * *'' The State takes the position that since no sworn answer was demanded by their bill that it cannot be considered as such. This obviously is a wrong conclusion, because any bill wherein an injunction is sought may be met by counteraverments or showing, and if done before the injunction is granted may be considered even though a sworn answer was not required.

It must be remembered in considering the only question we have presented here, that is the denial of the injunction, that in granting an injunction the Chancellor has broad discretion. Gibson, 5th Ed., sec. 879 and sec. 903. The Chancellor in this case refused to grant this injunction for reasons as stated by him because it would be inequitable to grant an injunction against one party while other parties in the action were shown to have likewise been violating the act by the tacit consent of the Commissioner who was attempting to have the injunction granted. The discretion of the Chancellor under such a situation means sound discretion, exercised, not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances of

law, and directed by the Chancellor's reason and conscience to a just result.

Since there may be many other things to be settled in this lawsuit under demurrers and answers of other parties and a request for a declaration, etc., the decree of the Chancellor in denying the injunction herein is affirmed, and the cause remanded to that court for any further proceedings necessary.