In Fireman's Fund American Insurance Co. v. Coleman [MS. August 8, 1980] ___ So.2d ___ (Ala. 1980), we recently had occasion to discuss our views regarding substantive due process under the Constitution of Alabama. The instant case provides an opportunity to continue that discussion, this time in the economic context, rather than that of common-law rights.
This declaratory judgment action challenges the constitutionality of Alabama's Certificate of Need Act, Act 82 (First Special Session 1977) (Code of Ala. 1975, § 22-21-260, et seq.) and Act 79-577 (Regular Session 1979). The purpose of the Act is to "prevent the construction of unnecessary and inappropriate health care facilities through a system of mandatory reviews of new institutional health services. . . ." Act 82. It is challenged by a proposed health care facility which was denied a certificate of need.
Plaintiff/appellant Mount Royal Towers, Inc. (Mount Royal), is an Alabama not-for-profit corporation incorporated for the purpose of constructing and operating a continuing care facility for the elderly, consisting of a 260-unit apartment building with a 76-bed skilled nursing home. The project, which is situated in Jefferson County, is being financed entirely with private funds and does not contemplate admitting Medicare or Medicaid patients. In addition to challenging the statute's constitutionality, Mount Royal contends that the statute's provisions are inapplicable to its facility. This argument is based on the following facts:
On June 26, 1978, Mount Royal, then Art Rice, Jr., d/b/a Mount Royal Towers, submitted to the Department of Public Health an application for review and for an assurance *Page 1211 
of need under Section 1122 of the Social Security Act. Under existing state law at that time, there was no prohibition against construction of a medical facility if the assurance of need was denied. That determination related solely to federal reimbursement of capital expenditures, which Mount Royal was not seeking. The assurance of need was denied on June 21, 1979.
The original Certificate of Need Act was enacted in 1977 and provided that no new institutional health service should be commenced unless the provider first obtained a certificate of need from the State Board of Health. However, by its terms, the statute was not to take effect until receipt of formal notification of approval of the bill by the Secretary of the Department of HEW. This approval was never obtained. The Legislature subsequently enacted Act 79-577 (Regular Session 1979), effective July 30, 1979, which amended the previous statute in several regards to comply with federal regulations, and declared the law implemented as of its effective date, rather than as of approval by the Department of HEW. By July 30, 1979, appellant had already entered into a written construction contract for the construction of the project, obtained its building permit, and made its first payment to the contractor. Mount Royal contends that any application of Act 79-577 to its facility would be retrospective and is thus barred.
On June 12, 1979, Mount Royal filed this action for declaratory judgment. The cause was submitted to the trial judge on motion for summary judgment; judgment was entered for defendants. This appeal followed.
Mount Royal's major constitutional challenge to the CON law is two-pronged: (1) It asserts that it is deprived of property and contract rights without due process of law in violation of Article I, §§ 6 and 22, and Article IV, § 95, Constitution of Alabama 1901; and (2) that the CON law constitutes a grant of special privilege to existing medical facilities in violation of Article I, § 22, Constitution of Alabama 1901. We are invited by Mount Royal to follow the lead of the Supreme Court of North Carolina, which invalidated that state's CON statute on similar grounds in the much-criticized case of In the Matterof Certificate of Need for Aston Park Hospital, Inc.,282 N.C. 542, 193 S.E.2d 729 (1973). See, Note, "Hospital Regulation After Aston Park: Substantive Due Process in North Carolina," 52 N.C.L.Rev. 763 (1974).
CON laws absolutely deny entry into a field of economic enterprise according to a criterion (public need) that is beyond the control of any individual. In determining the validity of such a regulation, we are necessarily asked to provide content to the phrase "due process of law." Such an inquiry involves a dual balancing, between the frequently competing interests of society and the individual, and between the power of the legislature to pass laws and that of the courts to review them.
The evolution of due process doctrine in Alabama as elsewhere has been influenced by decisions of the United States Supreme Court in interpreting the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution. Accordingly, any discussion of substantive due process in the economic context in Alabama must be set against the backdrop of the federal opinions.
To restate what is familiar: From 1897 through the 1930's, the Supreme Court of the United States was active in striking down state legislation on substantive due process grounds. The due process clauses of the United States Constitution were used to invalidate minimum wage laws, statutory standardizations of bread loaf weight, laws limiting employment in bakeries to ten hours a day and a host of other state social and economic regulations. A.E. Dick Howard, "State Courts and Constitutional Rights in the Day of the Burger Court," 62 Va.L.Rev. 873, 879-80 (1976). With the 1930's, however, came a reversal of policy occasioned in part by the pressing need to utilize state police power to deal with catastrophic economic conditions. Beginning in 1936, the Court eschewed overruling economic regulations which it found merely unwise or unfair, taking the view that it did *Page 1212 
not "sit as a superlegislature" to weigh the wisdom of state legislation, nor to choose between competing economic theories:
 "If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty.
Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 516,78 L.Ed. 940 (1934), discussing price control regulation of the milk industry.
This "hands-off" approach to judicial review of economic regulation was followed by many state courts, including Alabama's. In Franklin v. State, 232 Ala. 637, 169 So. 295
(1936), this Court was faced with a challenge to Alabama's Milk Control Board Act, Alabama's counterpart of the New York statute which was upheld by the United States Supreme Court inNebbia, supra. The act, which was passed in response to what were perceived to be emergency conditions in the milk industry, designated natural marketing areas within the state, and set minimum and maximum prices for the sale of milk within those areas. After noting that Nebbia foreclosed a constitutional attack on the statute on federal grounds, the Alabama Court discussed the state due process issue:
 "[T]he mudsill question to be determined is whether or not the enactment was a reasonable exercise of the police power of the state; or, in other words, whether the relief intended to be given is of a character appropriate to the existing emergency, and reasonably intended to protect against, or to alleviate, the calamitous conditions prevailing or threatened.
 The limits of a state's police power have never been fixed, nor its boundaries defined. It is not subject to any definite limitations or boundaries, but it represents the state's great reserve power, and is at all times coextensive with the necessities of the case and the safeguard of the public interest. State v. Kartus, 230 Ala. 352, 162 So. 533, 101 A.L.R. 1336, 1337; Camfield v. United States, 167 U.S. 518, 524, 17 S.Ct. 864, 42 L.Ed. 260." (Emphasis added.)
Franklin v. State, supra at 298.
It then concluded that the milk industry was of vital importance to the public, and so "affected with a public interest," that it was necessarily subject to the exercise of the police power, and to regulation and control. Ibid. at 299. The statute was upheld. This Court has never abandoned this view. The U.S. Court of Appeals' opinion that the act was unconstitutional was based upon other grounds. Dairymen, Inc.v. Alabama Dairy Commission, 584 F.2d 707 (5 Cir., 1978).
This "affected with the public interest" standard soon came to be used to justify a more interventionist stance on the part of the Alabama Supreme Court, however. If the Court found that a particular industry sought to be regulated was "affected with a public interest," it continued to defer all but absolutely to the legislature's determination of the wisdom of the regulation. Simonetti, Inc. v. State, 272 Ala. 398, *Page 1213 132 So.2d 252 (1961), affirming the validity of the Unfair Cigarettes Sales Act; McCrory v. Wood, 277 Ala. 426,171 So.2d 241 (1965), finding the practice of optometry affected with the public interest and subject to regulation. If, however, the Court determined that the industry or practice regulated was not affected with the public interest, it exercised a more exacting scrutiny of the regulation and its reasonableness. InCity of Mobile v. Rouse, 233 Ala. 622, 173 So. 266 (1937), for example, a price-fixing ordinance regulating laundries and barbers was struck down. Although the declared purpose of the regulation was to combat a "state and national emergency productive of widespread unemployment and disorganization of trade which burdens commerce and affects the public welfare,"Ibid. at 266, the Court held that "personal service cannot become affected `with public interest' unless the service rendered is official in character, or is rendered in connection with a business `affected with public interest' or `devoted to a public purpose.'" Ibid. at 268. The regulation was struck down as violative of "the right of an individual engaged in an inherently lawful occupation to fix the price for which he will render personal service [which] is a part of the liberty reserved to him against governmental encroachment, protected by the Constitutions, both State and Federal." (Citations omitted.) Ibid. at 267.
More recently, this Court has explicitly recognized that the "affected with a public interest" standard articulated inFranklin v. State, supra, is more restrictive than the "arbitrary or capricious" standard set forth in Nebbia, supra. In Estell v. City of Birmingham, 51 Ala. App. 462,286 So.2d 866, aff'd 286 So.2d 872 (1973), an "anti-scalping" ordinance, by which the City of Birmingham regulated the sale of tickets to the annual Alabama-Auburn football game, was struck down in language reminiscent of pre-1936:
 "It is our opinion that the ordinances in question in the case at bar, even though ostensibly attempting to protect the public interest, in fact transcend the limits of the police power, and constitute an arbitrary interference with private business by imposing unusual and unnecessary restriction upon a lawful occupation."
Ibid. at 870.
The Court of Criminal Appeals acknowledged that "the Alabama Supreme Court did not adopt in its entirety the Nebbia doctrine in its holding in Franklin, supra but adhered to a more narrow standard; namely `affectation with a public interest' to the extent of finding the dairy industry virtually a public utility and thus amenable to statutory regulation." Ibid. at 869-870.
In these cases, as in those discussed in Fireman's Fund, supra, which involved § 13, Constitution of Alabama 1901, the Court engages in an independent assessment of the benefits to be provided by a given statute. The justifications for this scrutiny are several.
Alabama is not alone among the states in exercising a more rigorous judicial scrutiny of state economic regulations. The survival of substantive due process in the state courts has been a subject of much interest to commentators of late. A.E. Dick Howard, "State Courts and Constitutional Rights in the Day of the Burger Court," supra, remarks that "A number of state courts . . . prefer a more searching inquiry into the justification for state regulation of economic activity." Alabama's "affected with public interest" standard is specifically noted as an example of this type of inquiry. Ibid.
at 884. See, also, Linde, "Without `Due Process,' Unconstitutional Law in Oregon," 49 Or.L.Rev. 125 (1970); Struve, "The Less-Restrictive-Alternative Principle and Economic Due Process," 80 Harv.L.Rev. 1463 (1967). Several commentators have suggested that the trend towards the development of independent approaches to substantive due process in the states is a positive one. John C. Hetherington, "State Economic Regulation and Substantive Due Process of Law," 53 N.W.U.L.Rev. (1958), contends that:
 "There are several reasons why state courts may be in a better position to review local economic legislation than the *Page 1214 
Supreme Court. State courts, since their precedents are not of national authority, may better adapt their decisions to local economic conditions and needs. . . . And where an industry is of basic importance to the economy of a state or territory, extraordinary regulations may be necessary and proper. Local variations in economic conditions thus may justify varying local standards of economic due process, whereas local conditions can rarely or never justify different standards under the first amendment. Hence in the latter field, control by a national judiciary is essential, while in the former, it may interfere with the development of local law to meet local needs.
 "[T]he problem of abuse of the police power . . . is real and important. The courts of the states, in their efforts to strike a balance between the economic freedom of the individual and the power of government, may well cause state constitutional law `to become of dominant importance,' and in so doing make a significant contribution to the growth of American law."
Ibid. at 250-251.
In response to the criticism that judicial invalidation of legislation is antimajoritarian, Hetherington points out that economic interest groups are often able to procure passage of legislation which is in their own, rather than the public interest: "Judicial invalidation of such legislation may be technically anti-democratic, but it can hardly be called frustration of the popular will in any meaningful sense. Such judicial action may serve to focus public attention on pressure group activities, and legislation which is struck down may not be reenacted." Ibid. at 249.
Finally, heightened scrutiny of legislation which infringes on individual property rights is entirely consonant with the mandate of our state constitution, which contains numerous guarantees of personal liberties, including those relied upon by appellants in the instant case. This Court has ever maintained its vigilance on behalf of individuals encroached upon by governmental regulation. This vigilance does not imply a preference by this Court for one economic system or theory over another, but a recognition that our constitution imposes limits upon the power of the legislature to impair the exercise of individual rights.
This said, we must now admit that an examination of our substantive due process cases reveals inconsistencies which we are at a loss to reconcile. Our "affected with public interest" test has produced strikingly different results in similar circumstances. Cases applying the test have found that, while the sale of cigarettes is so affected with the public interest as to justify regulation and price-setting, Simonetti, Inc. v.State, supra, the sale of gasoline is not. Alabama IndependentService Station Association v. McDowell, 242 Ala. 424,6 So.2d 502 (1942).
Milk may be regulated, Franklin, supra, but barbers and laundries may not, Rouse v. City of Mobile, supra, nor may ticket scalping. In distinguishing between sales of milk and sales of football tickets, the Court said only that "the vast difference between the ways in which public entertainment and milk affect the public is not arguable." 286 So.2d at 874. It is evident that the test is conclusory: Once an industry has been found to be affected with the public interest, a regulation concerning it will be sustained; a finding that it is not affected with the public interest will, as a practical matter, result in the invalidation of legislation attempting to regulate it. The weakness of this test is that it does not force careful scrutiny of the challenged law, nor does it require an explicit enunciation of the Court's reasoning.
We hold that, where legislation affects protected economic interests or liberties, it must be tested against the public purpose sought to be served, and there must be a legitimate bona fide relationship between a permissible public purpose and legislation passed to further that end. Or, stated differently, there must be in fact a demonstrable public need to be balanced against protected interests impaired by legislation, and the balance struck between *Page 1215 
individual rights and the public welfare must be reasonable and fair. Factors which may be taken into account in this assessment are the degree of the burden which the legislation imposes, the importance of the right infringed upon, and the gravity of the conditions with which the legislation attempts to deal. This is not a departure from the rule followed in earlier cases, but merely a rearticulation of the test.Franklin itself, which established the affected with public interest test, defined the issue in determining the validity of economic regulation attacked upon constitutional grounds to be "whether the relief intended to be given is of a character appropriate to the existing emergency, and reasonably intended to protect against, or to alleviate, the calamitous conditions prevailing or threatened." 169 So. at 298.
We turn now to the application of this test to Alabama's CON law. We find no constitutional infirmity therein. The provision of health care services is of unquestionable public importance. Extensive regulation of the medical profession and hospitals has universally been upheld. Hetherington, supra, at p. 229. Although restriction of entry into a field of economic endeavor is a severe infringement on individual contract and property rights, there is no indication that elimination of surplus hospital beds in a community through licensing and CON laws is not logically calculated to reduce medical costs caused by duplication of services. "Bed capacity is a factor in the distribution of medical resources which in turn determines the quality, quantity, and cost of medical care." "Hospital Regulation After Aston Park," supra, at 782. "The hospital industry is characterized by huge fixed costs devoted to property that cannot be converted to other uses. Where oversupply occurs, substantial waste stands to take place." Id.
784.
The judgment of the trial court is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES and EMBRY, JJ., concur.
BEATTY, J., concurs in the result.
ALMON, J., dissents.