This is an appeal from the granting of a summary judgment.
The record in pertinent part reveals the following: In July 1984, the Alabama State Health Planning Agency (SHPA) issued Alabama Renal Stone Institute, Inc. (ARSI), a Certificate of Need (CON) to purchase a lithotripter in order to conduct extra-corporeal shockwave (ESW) lithotripsy for kidney stone patients. The cost was approximately $1,850,000. The ESW lithotripter purchased by ARSI uses shock-waves transmitted through water to shatter kidney stones in a patient immersed in a bath. The CON was both machine and service specific in its authorizations. Under the heading "Services to be Performed" the CON specifically provided: "Purchase of equipment to conduct extra-corporeal lithotripsy for kidney stone patients." Subsequently, Springhill Memorial Hospital (Springhill) was issued a CON for a similar renal (kidney) stone lithotripter.
On September 30, 1988, an Investigational Device Purchase Agreement was entered into between Medstone International, Inc. (Medstone) and Baptist Medical Centers (Baptist), whereby Baptist agreed to purchase from Medstone a mobile shockwave lithotripsy device at a price of $1,375,000. As noted in the agreement, the acquisition of the lithotripter was made in order to allow Baptist to participate in clinical study and research on the use of the device in treating gallstones. In fact, Medstone set out in the agreement that the device has a short history of operations, that it is experimental, that it does not have a pre-market approval (PMA) granted by the Food and Drug Administration (FDA), and that there is no assurance a PMA will be issued for the device for the treatment of gallstones.
Baptist entered into lease agreements or other arrangements with DCH Healthcare Authority (DCH) and The Hospital Authority of the City of Huntsville (Huntsville), to allow usage of the mobile lithotripter. (Baptist, DCH and Huntsville will hereinafter be referred to collectively as Hospitals.) SHPA granted the above facilities a CON for the use of the Medstone device for biliary (gallstones) lithotripsy, and the device was placed into use in April 1989. We note that, when the Hospitals acquired the Medstone lithotripter, they knew that the device would perform both biliary (gallstones) and renal (kidney) lithotripsy. However, the Hospitals only requested a CON to perform gallstone lithotripsy.
In June 1989, only two months after the Hospitals began using the Medstone lithotripter, pursuant to their CON for gallstone lithotripsy, DCH filed a petition for declaratory relief with SHPA, requesting it to rule that the use of the lithotripter for shattering kidney stones was not a new institutional health service, thereby negating the necessity of a CON for kidney lithotripsy. In its petition, DCH argued that it had performed renal electrohydraulic lithotripsy and renal ultrasonic lithotripsy for a number of years and, thus, asserted that its conversion of the Medstone lithotripter from use in shattering gallstones to use in shattering kidney stones was not a new institutional health service as defined in Ala. Code 1975, § 22-21-263.
After a hearing on the petition, SHPA refused to make any ruling citing insufficient information to make a decision. The dispute then reached the judicial arena. The parties filed cross-motions for summary judgment, and the trial court found that the offerings of kidney lithotripsy services by the Hospitals were not "a new institutional health service," and that a certificate of need (CON) was not required, citingKoch v. Houston County Hospital Board, 432 So.2d 1309
(Ala.Civ.App. 1983). ARSI and Springhill appeal.
The dispositive issue on appeal is whether the trial court erred in concluding that kidney lithotripsy services were not a new institutional health service.
SHPA, by statute, has been designated as an agency of the state to be responsible for state health planning and development. Ala. Code 1975, § 22-21-260. SHPA performs *Page 108 
its responsibilities in regulating health programs through the management of the CON program. As declared by the legislature, the CON program is needed to prevent the construction of unnecessary and inappropriate health care facilities. Ala. Code 1975, § 22-21-261. Indeed, the Alabama Supreme Court has expressly noted that extensive regulation of the medical profession is needed, because the hospital industry has huge fixed costs devoted to property that cannot be converted to other uses and where oversupply occurs, substantial waste stands to take place. Mount Royal Towers, Inc. v. Alabama Boardof Health, 388 So.2d 1209 (Ala. 1980).
All new institutional health services which are proposed to be offered or developed within the state are subject to review by SHPA in the manner provided by statute and by regulation. Institutional health services are defined as:
 "Health services provided in or through health care facilities or health maintenance organizations, including the entities in or through which such services are provided."
Ala. Code 1975, § 22-21-260(13).
A new institutional health service is also defined by statute to encompass four distinct circumstances. Ala. Code 1975, §22-21-263(a). The only one we find applicable to the case before us is § 22-21-263(a)(4):
 "Health services proposed to be offered in or through a health care facility or health maintenance organization, and which were not offered on a regular basis in or through such health care facility or health maintenance organization within the 12 month period prior to the time such services would be offered."
Classification of a proposed service as a new institutional health service has a direct impact upon the processing of and necessity for a CON application. By express statutory provision, no health provider is permitted to acquire, construct, operate or furnish a new institutional health service, or make arrangements for the financing or offering of a new institutional health service, without first obtaining a CON from SHPA. Ala. Code 1975, § 22-21-265. Of course, if it is determined that the service does not rise to the level of a new health service as defined by statute, then no CON is required.
Here, the Hospitals contend that they do not need to apply for, or be granted, a CON in order to use the Medstone Lithotripter to shatter kidney stones. They argue that the Medstone Lithotripter was already FDA-approved for kidney lithotripsy when it was first placed into service by the Hospitals, and that they were all capable, at the very latest, of providing kidney lithotripsy services as soon as the unit was in service at the last hospital.
Further, they argue that they have been treating patients suffering with kidney stone ailments for years through a variety of modalities. The treatment provided ranges all the way from the mere observation of and pain maintenance for patients capable of passing such stones without intervention, to invasive surgical procedures to remove such stones. These treatments also include the use of electrohydraulic lithotripsy, renal ultrasonic lithotripsy, renal lasertripsy, and mechanical renal stone removal. Therefore, they contend that since they have been providing, or at least have been "capable" of providing, kidney lithotripsy services since at least May 8, 1989, (the date the mobile unit was in service at the last hospital), they are not required to get a CON.
There is no dispute that the Hospitals here have a history of providing their patients with some form of a kidney stone treatment. However, it is also undisputed that at the time of the hearing before SHPA, as well as at the hearing before the trial court, the Hospitals had not used the Medstone Lithotripter to perform any kidney lithotripsy. Therefore, it is this court's opinion that the Hospitals' desire to use the Medstone Lithotripter to perform kidney lithotripsy is a procedure which has not been offered on a regular basis at the Hospitals. Ala. Code 1975, § 22-21-263(a)(4). Consequently, we find that the Hospitals are required to request and be granted a CON prior to using the Medstone device in a capacity other than that for *Page 109 
which it has been issued a CON. In other words, the Hospitals may certainly use the Medstone device for the purpose it was acquired for, i.e., clinical study and research in treating gallstones.
To allow the Hospitals in this instance to use the Medstone device to perform kidney lithotripsy without first obtaining a CON would, in this court's opinion, be contrary to the intent of the legislature in establishing SHPA. As noted above, the hospital industry is characterized by huge fixed costs, and when oversupply occurs there is a great likelihood that substantial waste will occur, Mount Royal Towers, which, consequently, in the future would adversely affect the overall care and treatment of the general public.
Here, two health care facilities are presently performing ESW kidney lithotripsy. Both ARSI and Springhill wished to offer this service and, therefore, complied with all applicable statutes and regulations in order to be granted a CON. After review of their application, as well as the need for such a service in the state, both facilities were issued a CON to perform "ESW lithotripsy for kidney stone patients" which resulted in a substantial capital investment of over 1.8 million dollars for ARSI's unit alone.
Now the Hospitals in the instant case want to get around the statute requiring them to obtain a CON by stating that they already have the one million dollar plus machine, and that they have the capability to perform the ESW lithotripsy on kidney stone patients. We find such argument to be without merit. While they do have the machine that will perform the ESW lithotripsy on kidney stone patients, it was acquired for the sole purpose of doing research on gallstone patients. We further point out that, although the Hospitals knew the machine would perform kidney lithotripsy, they did not request a CON to perform this service. Surely, a facility cannot acquire an expensive piece of medical machinery specifically to perform research studies for one service and then within months simply bypass the statutory requirements of a CON and perform another service for which they have not received SHPA approval. This is especially true where, as in the instant case, two other facilities had already complied with the CON requirements and made a substantial capital expenditure to perform these services.
We also point out that, when the Hospitals filed their motions for a declaratory judgment, the State Health Plan (SHP), in effect (1988-1992), specifically stated that lithotripter services would be addressed by functional types, i.e., renal (kidney) lithotripters and biliary (gallstone) lithotripters. The SHP stated that Alabama only has a need for 1.5 kidney stone lithotripters by 1992. Further, the SHP stated that as additional needs are identified, such needs will be met by placement of units in the most populous metropolitan areas, consistent with diffusion for accessibility and with cost containment.
In view of the SHP, we are further convinced that the services offered by the Hospitals were indeed "new institutional health services" and that Koch is not applicable. Further, we find that what the Hospitals are attempting to do is circumvent the statutory requirements of § 22-21-263. To hold otherwise would be contrary to the overall purpose and intent of the legislature in creating the SHPA and the CON review board.
In view of the above we find that, as a matter of law, the trial court erred in granting a summary judgment in favor of the Hospitals. Rather, it should have granted a summary judgment in favor of ARSI and Springhill and required the Hospitals to follow the statutory procedure in order to be granted a CON.
REVERSED AND REMANDED WITH DIRECTIONS.
THIGPEN, J., concurs.
RUSSELL, J., concurs in result only. *Page 110